# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

# FLORENCE DIVISION

| | |
|---|---|
| Jonathan Lewis, ) | Case No.: 4:23-cv-01720-JD |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **DEFENDANT'S RESPONSE TO** |
| ) | **PLAINTIFF'S MOTION TO EXCLUDE** |
| Circle K Stores, Inc., and John Doe, ) | **DEFENDANT'S EXPERTS** |
| ) | |
| ) | |
| Defendants. ) | |

**COMES NOW** the Defendant in the above-captioned case, by and through undersigned counsel, to oppose Plaintiff's motion *in limine* for an Order excluding the reports and testimony of Defendant's experts Dr. Joseph Calandra and Brandon L. Wiggins from the trial of this matter. The grounds for this opposition are set forth below.

## STATEMENT OF FACTS

This case involves a slip and fall incident at Circle K's premises in Horry County, South Carolina on October 19, 2022. Plaintiff Jonathan Lewis alleges that he ruptured his right patellar tendon after he slipped and fell on a wet surface. Compl.¶ 10. Specifically, Plaintiff alleges that Circle K created an "unreasonably dangerous condition in the form of a slip hazard" by mopping the store entrance. *Id.* at ¶ 11. This matter was removed to the United States District Court for the District of South Carolina, Florence Division on April 26, 2023, by Defendant Circle K and is before the Court pursuant to its diversity jurisdiction.

## **LEGAL STANDARD**

The principal case that determines the admissibility of expert testimony under FED. R. EVID. 702 is *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509, U.S. 579 (1993). Per *Daubert*, the Court should function as a gatekeeper to ensure that an expert's testimony is both relevant and reliable. *Id.* at 597. Evidence is relevant if it helps the trier of fact either understand the evidence or to determine a fact at issue. *Nease v. Ford Motor Co.*, 848 F.3d 219, 228 (4th Cir. 2017). More specifically, expert testimony is relevant under Daubert if it has a "valid scientific connection to the pertinent inquiry. *Daubert* 509 U.S. at 592. Reliable evidence is evidence that is based on scientific, technical, or other specialized knowledge and not on belief or speculation. *Nease,* 848 F.3d at 229 (citing *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). In *Daubert,* the Court announced five factors that may be used in assessing the reliability of expert testimony: (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *Id*. at 593–94.

Rather than providing a definitive or exhaustive list, *Daubert* merely illustrates the types of factors that will "bear on the inquiry." *Id.* at 594. As *Daubert* emphasized, the analysis must be "a flexible one." *Id.; see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141–42 (1999) (concluding that testing of reliability should be flexible and that *Daubert* 's five factors neither necessarily nor exclusively apply to every expert). Finally, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702, Advisory Committee's Note to 2000 Amendments.

## **ARGUMENT**

**I.     Dr. Calandra's testimony should not be excluded because it is based on scientific principles and methodology, is not merely for the purposes of litigation, and is generally accepted in the orthopedic medical community.**

**a. Dr. Calandra's opinions are reliable because they are scientifically valid.**

As a threshold matter, Plaintiff does not dispute the relevance of Dr. Calandra's testimony. Likewise, Plaintiff does not dispute Dr. Calandra's qualifications; he is a board-certified orthopedic surgeon and has taught as a clinical professor at the Medical University of South Carolina. Rather, Plaintiff attacks the reliability of his testimony. However, Dr. Calandra's review of Plaintiff's medical records, deposition testimony, and the video footage of Plaintiff's fall are reliable sources from which to render his opinions to a reasonable degree of medical certainty.

Despite Plaintiff's arguments to the contrary, expert testimony must not necessarily be derived from the scientific method. Rather, the Court in *Daubert* established that an expert's testimony be based on "scientific knowledge" and defined that requirement of Rule 702 as "establish[ing] a standard of evidentiary reliability" or "trustworthiness," which essentially means "scientific validity." *Daubert*, 509 U.S. at 601, n. 9. To be scientifically valid, an expert's opinion must be "ground [ed] in the methods and procedures of science" and "supported by appropriate validation." *Id.* at 590; *see United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir.), *cert. denied*, 515 U.S. 1168, 115 S.Ct. 2631, 132 L.Ed.2d 871 (1995).

The Federal Rules of Evidence make clear that an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. FED. R. EVID.

703. In fact, the advisory committee's note to Rule 703 specifically contemplates opinions from non-treating physicians:

> The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception ... Thus, a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays … The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes. Rheingold, *supra*, at 531; McCormick §15.

FED. R. EVID. 703 advisory committee's note on proposed rules.

Further, in *Carson v. Walmart Stores East, L.P.*, this Court, specifically, the Honorable Joseph Dawson, III, held that a defendant's medical expert's review of a plaintiff's medical records and the security camera video were relevant and reliable methods for him to base his opinions on. No. CA: 4:22-CV-03654-JD, 2024 WL 3927803, at 4 (D.S.C. Aug. 21, 2024) (citing *Riggins v. SSC Yanceyville Operating Co., LLC*, 800 F. App'x 151, 155–56 (4th Cir. 2020)). In that case, the plaintiff alleged that she slipped and fell on a grape in a Walmart store and suffered a traumatic brain injury (TBI), neck injuries, headaches, and other medical issues as a result. *Id.* at 1. The defendant engaged a neurologist, Dr. Garrett, to provide expert testimony regarding whether the plaintiff suffered a TBI that developed into post-concussive syndrome, and he opined that the plaintiff did not experience loss of consciousness, confusion, disorientation, post-traumatic amnesia, or transient neurological abnormalities immediately following the injury. *Id.* at 4.

The plaintiff moved to exclude Dr. Garrett's testimony, arguing that his opinions were not based on reliable methods or sufficient facts or data. *Id* at 3. Specifically, the plaintiff argued that Dr. Garrett's opinion that the plaintiff did not suffer a TBI was based on speculation and an unreliable method; namely, a review of 8,000 pages of Plaintiff's medical records and the

inaudible security camera video. *Id.* However, this Court held that Dr. Garrett's opinions were, to a reasonable degree of medical certainty, based on a reliable application of appropriate diagnostic methods to sufficient data and denied the plaintiff's motion to exclude his testimony regarding her alleged TBI accordingly. *Id* at 4. Thus, the Court effectively determined that a robust review of medical records and silent video surveillance of the incident were sufficient facts and data from which to formulate an assessment of Plaintiff's medical condition. *Id.*

Here, Dr. Calandra's opinions pass *Daubert* muster because they are based on a reliable application of appropriate diagnostic methods to sufficient data to a reasonable degree of medical certainty. First, Plaintiff may not circumvent the Federal Rules of Evidence by suggesting that Dr. Calandra's opinions are unreliable simply because they depend on the contents of Plaintiff's relevant medical history. The language of the advisory committee's note to Rule 703 makes clear that any medical doctor would rely upon medical records and/or history to come to a conclusion regarding a patient's condition. This is particularly true in the case of chronic orthopedic injuries where the diagnosis is dependent on symptoms occurring over a period of time; therefore, Dr. Calandra basing his opinions on the same is permissible.

Second, that Dr. Calandra's specific method used to reach his opinions in this case is not "falsifiable or scientifically evaluable for an error rate" is not dispositive. The first potential reliability factor set out by the Supreme Court in *Daubert* is whether a particular scientific theory or technique "can be and has been tested." *Id.*, 509 U.S. at 593-94. Dr. Calandra testified in his deposition that short of having Plaintiff try to recreate the exact conditions and "stub his toe again on his other leg," his opinions from this case were not testable, as they are specific to Plaintiff's body type, preexisting conditions, walking surface, etc. Calandra Dep. 74:18-25. Additionally, he admitted that he has not documented how often his opinions given in litigation

have been "correct or incorrect," meaning how many times a jury sided with the party he was testifying on behalf of versus the opposing party. *Id.* at 77:12-18. However, he acknowledged that juries may have sided with one party over another for reasons entirely unrelated to his opinion given the difference between their "specificity and sensitivity." *Id.* at 78:13-79:5. This dissonance between Dr. Calandra's medical testimony and the jury's ultimate verdict is not the "known or potential rate of error" scenario that the third potential *Daubert* reliability factor contemplates. *See Daubert,* 509 U.S. at 593-94. Thus, Plaintiff misconstrues the meaning of "error rate," as it applies to a *Daubert* determination. Lastly, and most importantly, Dr. Calandra agrees with *Plaintiff's* own treating physicians that Plaintiff suffered a torn patellar tendon in his right leg on October 19, 2022. Why Defendant's expert must jump through two additional *Daubert* hoops, namely, that to testify regarding an undisputed fact in evidence seems to defeat the very purpose of the Court's gatekeeping function.

That being said, Dr. Calandra's approach might indeed be disputed by Plaintiff's experts, had he chosen to retain any. However, the expert disclosure deadline has expired and Plaintiff did not disclose a medical expert, other than the treating physicians *who concur with Defendant's expert*. Had Plaintiff retained an expert, he or she could have presented contrary positions to Dr. Calandra's. In this sense, his opinion would be "falsifiable." Plaintiff's decision not to retain a rebuttal expert does not mean Dr. Calandra's opinions are not falsifiable; rather, Plaintiff simply chose not to conduct the exercise to determine if alternative opinions could be obtained.

Moreover, despite Plaintiff's assertions to the contrary, whether an expert's method for coming to his opinions is falsifiable or scientifically evaluable for an error rate are merely two of numerous factors that the Court may consider in determining whether an expert's opinion is scientifically valid. *See Kumho Tire*, 526 U.S. at 150. Much like Dr. Garrett did in the *Carson*

case, Dr. Calandra reviewed nearly two decades' worth of Plaintiff's medical records, totaling nearly 800 pages, as well as the security footage of this incident in forming his opinions. This Court left no question that Dr. Calandra's review of (1) Plaintiff's medical records related to prior orthopedic injuries (specifically, records from prior patellar tendon ruptures in both knees and records from treatment related to the subject patellar tendon rupture), (2) Plaintiff's deposition testimony regarding the fall, and (3) the video footage of the fall itself are sufficient methods of information to render a reliable opinion regarding medical causation.

> **b. Dr. Calandra's opinions in this case are confirmed through his wealth of training, experience, and knowledge in the field of orthopedic surgery, well-established in medical literature, and reinforced by Plaintiff's treating orthopedic surgeons.**

Contrary to Plaintiff's assertion, Dr. Calandra's opinions are reliable and not tailor-made for this litigation because the theory and technique behind them have garnered "general acceptance" in the orthopedic surgery community. *See Daubert*, 509 U.S. at 593-94; *see also Nease*, 848 F.3d at 232 ("*Daubert* also suggests that district courts, in performing their gatekeeping functions, consider whether and to what extent an expert's theory has been accepted within the relevant scientific … community."). Plaintiff makes much ado about the fact that Dr. Calandra did not rely on any specific studies to reach his opinions in this case to suggest that he "tailored" his opinions for the requirements of litigation. However, Dr. Calandra testified that the information behind his opinions regarding the mechanism of the injury, Plaintiff's preexisting conditions and comorbidities, and the causal order of events were "common knowledge" for an orthopedic surgeon. Calandra Dep. 46:2-6. Dr. Calandra has been practicing medicine since 1982 and has been board certified by the American Board of Orthopaedic Surgery since 1992. In addition, he served as an Assistant Clinical Professor at MUSC in the Department of Orthopaedic Surgery for fifteen years, from 2003-2018. Further, he serves and has served in

editorial positions on the journal review for Clinical Orthopaedics and Related Research and The Journal of Arthroscopy, respectively.

Plaintiff uses the fact that Dr. Calandra did not rely on peer-reviewed studies about patellar tendon injuries as a basis for excluding his testimony while ignoring his four decades of hands-on experience regarding the same. *See Follmer v. Pro Sports, Inc.*, No. CV 2:22-743-RMG, 2023 WL 5500871, at 2 (D.S.C. July 17, 2023) (rejecting Plaintiffs' contention that Defendant's expert's opinions should be *per se* excluded because he did not rely on any studies or literature to support his opinions on breach where Plaintiffs cited no case law for the proposition that an expert's testimony must be excluded where it fails to cite relevant "peer reviewed" literature.) Over the course of his forty-two-year career, he has identified, seen, and corrected numerous patellar tendon injuries and taught hundreds of medical students how to do the same; therefore, it is unnecessary for him to perform additional research on them in order to form his opinions.

Even so, Dr. Calandra testified that though he never published peer-reviewed papers specifically related to patellar tendon ruptures nor relied upon specific studies regarding the same in forming his opinions in this case, he was aware of several such studies that support his opinions. Calandra Dep. 47:20-21; 49:7-14; 60:8-61:18. He has provided several supporting

studies that confirm his opinions regarding smoking weakens the tendons and impairs healing,[1] the increased stress put on tendons from obesity leading to tendon rupture,[2] and the mechanism of a patellar tendon injury generally.[3]

Moreover, Plaintiff's treating orthopedic surgeons involved in this case, Dr. Butler and Dr. Evans, agree with Dr. Calandra's conclusion regarding the mechanism of injury of a patellar tendon rupture. Dr. Calandra testified that it is well-known in the field of orthopedic surgery that a patellar tendon rupture typically occurs when a patient has a "forced extension of a fixed flexion," e.g., sitting in a chair with your toe behind you on the ground and trying to straighten your leg or falling down the stairs and trying to catch yourself. Calandra Dep. 22:5-18; 27:1-2; 44:2-11; 50:12-21. Accordingly, all three surgeons agree that stubbing a toe and then trying to extend the leg to catch a fall is what orthopedic surgeons refer to as a "fixed extension of a forced flexion," which often results in a patellar tendon rupture. Calandra Dep. 22:5-18; Evans Dep. 38:23-39:19. Notably, Dr. Butler, Plaintiff's treating surgeon for his previous bilateral

---

[1]   Adnan N. Cheema et al., *Nicotine Impairs Intra-Substance Tendon Healing After Full Thickness Injury in a Rat Model*, (2018), J. of Orthopaedic Research, 37(1), 94-103. https://doi.org/10.1002/jor.24167; Sarah Connelly et al., *Levoflaxin-Induced Bilateral Achilles Tendinopathy*, 55 The Can. J. of Hosp. Pharm. no. 3, 2002, https://doi.org/10.4212/cjhp.v55i3.575; Abate M, Vanni D et al., *Cigarette smoking and musculoskeletal disorders*. Muscles Ligaments Tendons J. 2013 Jul 9;3(2):63-9. doi: 10.11138/mltj/2013.3.2.063. PMID: 23888288; PMCID: PMC371170; Jacob F. Oeding et al., J.F., (2023) *Complications and re-operations after extensor mechanism repair surgery in a large cross-sectional cohort: females and tobacco-users at highest risk for adverse outcomes*. 31 Knee Surgery, Sports Traumatology, Arthroscopy 2, 455–463 (2023) https://doi.org/10.1007/s00167-022-07061-9.

[2]   Raul H. Juliato et al., *Bilateral Atraumatic Patellar Ligament Rupture- Case Report,* 54 Rev. Bras. Orthop., Mar.-Apr. 2019, https://doi.org/10.1016/j.rbo.2017.12.023; Brian M. Kelly et al., 82(3) *Bilateral, simultaneous, spontaneous rupture of quadriceps tendons without trauma in an obese patient: a case report*, Arch. Phys. Med. Rehab. 415–418 (2001).

[3]   Brinkman JC et al., *Acute Patellar Tendon Ruptures: An Update on Management.* J Am Acad Orthop Surg Glob Res Rev. 2024 Apr 3;8(4):e24.00060. doi: 10.5435/JAAOSGlobal-D-24-00060. PMID: 38569093; PMCID: PMC10994452.

tendon ruptures, used the inverse of that phrase in his deposition, "a forced extension against a fixed flexion," but when asked to describe what that phrase meant, he concurred with Dr. Calandra's description and confirmed that these kinds of injuries are always acute and usually occur when a patient trips or stumbles. Butler Dep. 15:13-17; 16:8-16. That Plaintiff's orthopedic surgeons involved in this case agree regarding Dr. Calandra's opinion regarding the mechanism of Plaintiff's injury further proves that it is widely taught and accepted in the field of orthopedics and not crafted solely for the purposes of litigation.

Lastly, and most importantly, Dr. Calandra's method of reviewing Plaintiff's medical records is typical practice (and therefore scientifically reproducible) in diagnosing a patient. It goes without saying that doctors review medical records every day in their treatment of patients, and Dr. Calandra's review of hundreds of pages of Plaintiff's medical history is no exception. For Plaintiff to criticize that doing so is specific only to forming opinions related to this litigation is unfounded. In sum, Dr. Calandra's opinions regarding Plaintiff's preexisting conditions, the cause of Plaintiff's injury, and the typical mechanism of injury for a patellar tendon tear are reliable.

## II. Dr. Calandra's opinions are helpful to the jury because they will aid the jury in determining the cause of Plaintiff's alleged injury.

Dr. Calandra's opinions are relevant because they are based entirely within the realm of orthopedic medicine and, as such, are beyond the common knowledge and experience of the lay juror. When determining whether an expert's testimony is relevant, the Court must consider whether it is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. *Daubert*, 509 U.S. at 593; *see also* FED. R. EVID. 702. "An expert's opinion is relevant if it has 'a valid scientific connection to the pertinent inquiry.'" *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). "Testimony from an expert is presumed to be

helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *see also Gutridge v. Costco Wholesale Corp.*, No. 4:20-CV-01696-JD, 2022 WL 2341408, at 4 (D.S.C. May 16, 2022).

Here, as a threshold matter, Dr. Calandra's opinions are helpful to the jury because he is the only medical expert involved in this case who has had the benefit of reviewing Plaintiff's medical history, the video, and Plaintiff's deposition transcript, meaning he has reviewed more information than Plaintiff's own treating doctors. That aside, it is beyond the ken of the lay juror to determine the etiology and/or mechanism of injury of an orthopedic injury such as a patellar tendon rupture. Indeed, the question is whether a *trip* (due to a toe drag, and unrelated to the condition on the ground) caused the patellar tendon rupture and then a subsequent fall, or whether the Plaintiff *slipped* and fell, causing the patellar tendon rupture.[4] This question can only be answered by medical experts. *See Goewey v. United States,* 886 F.Supp. 1268, 1279 (D.S.C.1995) (asserting that "[w]here a medical causal relation issue is not one within the common knowledge of the layman, proximate cause cannot be determined without expert medical testimony). Whether Plaintiff slipped or the tendon rupture preceded the fall is a crucial fact for the jury to consider when determining fault in this case, and Dr. Calandra's testimony would aid the jury in determining that fact at issue.

Plaintiff's assertions that Dr. Calandra's opinions are couched in "hypothetical language" and therefore not helpful to the jury are taken out of context. Plaintiff asserts that he *slipped* and fell on the date of the incident. However, Dr. Calandra's opinions refute that assertion. He testified that to a reasonable degree of medical certainty one of two scenarios occurred regarding Plaintiff's injury: Plaintiff's patellar tendon ruptured first (based on his description to EMS

---

[4] This is not a genuine issue of material fact because no treating physician or expert disagrees about the mechanism of injury.

personnel that he heard a "pop" that caused him to fall) and he fell as a result, or he tripped and ruptured his patellar tendon as a result. Calandra Dep. 21:23-22:18. He testified that he was 75%-90% certain in those opinions. *Id.* at 80:15-19. That Dr. Calandra considers two alternative possibilities for the cause of Plaintiff's injury does not remove them from the expert testimony framework. When viewed in context of the substance of his entire testimony, Dr. Calandra's opinions conform to the requisite standard for expert testimony that a cause other than Plaintiff's alleged one resulted in his injury. *Riggins v. SSC Yanceyville Operating Co., LLC*, 800 F. App'x 151, 155–56 (4th Cir. 2020) ("[T]he expert's testimony as a whole must demonstrate his or her opinion is held to a reasonable degree of medical certainty.").

### III. Wiggins's opinions do not invade the province of the jury because they do not state a legal standard or draw a legal conclusion.

In his Motion, Plaintiff erroneously suggests that Brandon Wiggins's opinion in this case draws a legal conclusion which would usurp the jury's factfinding role. The Fourth Circuit addressed the question of how to distinguish opinion testimony that embraces an ultimate issue (which Wiggins offers) from opinion testimony that states a legal conclusion in *United States v. Barile*. In that case, Defendant was appealing his conviction for making materially false statements in a 510(k) submission to the FDA regarding a cardiac monitor his company manufactured and marketed. 286 F.3d 749, 752 (4th Cir. 2002). Per Section 510(k) of the Federal Food, Drug, and Cosmetic Act, he was required to notify the FDA of any enhancements to a cardiac device before marketing it and verify it was "substantially equivalent" to a device already on the market. *Id.* He argued that the district court erred by excluding opinion testimony from his expert, the author of the guidance document outlining requirements for 510(k) submissions, that his 510(k) submissions "were not unreasonable and did not contain materially misleading

statements." *Id.* at 761. The Fourth Circuit held that the best way to determine whether opinion testimony contains legal conclusions and should therefore be excluded, "is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *Id.* at 760 (citing *Torres,* 758 F.2d 147, 151 (6th Cir. 1985); *Lecureux,* 110 F.3d at 1220). The Court held that opinion testimony on whether the data submitted in a 510(k) submission were reasonable would not merely state a legal conclusion; in fact, the Court held that the expert's opinion on reasonableness was "precisely the type of expert testimony that could assist the trier of fact in its determination" and therefore is not excludable on the ground that it invades the province of the jury. *Id.* at 761; *see also Donnelly v. Linden Cap. Partners III, L.P.*, No. 2:20-CV-3719-RMG, 2022 WL 2314611, at *6 (D.S.C. June 28, 2022) (holding that Defendant's private equity expert's opinion concerning whether Defendant reasonably determined that Plaintiff was not entitled to certain transaction fees in a breach of contract and unjust enrichment action does not state a legal conclusion and is not excludable.)

Here, Plaintiff attempts to discredit Wiggins's conclusion that "[b]ased on the documents reviewed by SEA Site Investigation, it has not been established that the walking surface at the time of the incident was not slip-resistant, and therefore it cannot be reasonably concluded that any applicable code relevant to the fall scenario has been violated" because he did not take independent measurements of slip resistance. However, as previously mentioned, an expert may properly rely on the data and conclusions of *other experts* under Rule 703 in coming to his or her opinions. *See* FED. R. EVID. 703 (stating "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of"); FED. R. EVID. 702 advisory committee's note ("The term 'data' is intended to encompass the reliable opinions of other experts."); *Funderburk*

*v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 717 (D.S.C. 2019) ("Generally, it is permissible for an expert to rely upon the opinions and findings of other experts to reach his or her expert conclusion...." (internal quotation marks omitted) (collecting cases)); *Lanzetta v. Hyundai Motor Am., Inc.,* No. 16CV03390, 2020 WL 13660570, at 1 (D.S.C. June 29, 2020).

Plaintiff's argument is understandable, as his own expert's testing yielded data favorable to the Defendant. Wiggins now rightly uses that data from Plaintiff's expert to render his opinion in this case. Plaintiff cannot hire an expert, disclose him, send him to the site for inspection and testing, and then complain when Defendant's own expert uses the results from Plaintiff's expert's testing. Wiggins and Plaintiff's engineering expert, Dr. Durig, both agree that using an English XL tribometer to conduct the slip-resistance testing at the subject store was the proper way to determine the coefficient of friction for the entrance walkway area. Wiggins Dep. 38:7; Durig Dep. 11:17-21. When Wiggins reviewed Dr. Durig's file material and saw that he had already conducted testing per the English XL method, he decided for the sake of efficiency to rely on that data as he is permitted to do under Rule 703.

Plaintiff further critiques Wiggins's opinions by suggesting that the use of the word "reasonably" brings his testimony into the "legal conclusion" realm, thus invading the province of the jury. Wiggins is a civil engineer, and as such, has the qualifications to speak to building codes, which is the only capacity for which he was engaged in this litigation by Defendant. Wiggins and Durig both testified that the building code for the subject area requires that means of egress should be slip resistant but does not delineate how to ensure slip-resistance, thus the use of tribometry and tools such as the English XL come into play to measure the coefficient of friction of a particular surface. Wiggins Dep. 122:1-6; Durig Dep. 58:20-25. Because both parties' engineering experts agreed that the entranceway area where Plaintiff fell measured slip

resistant per the 2021 International Building Code (*See* Defendant's Motion for Summary Judgment at ECF No. 39), Wiggins's conclusion that "it cannot be reasonably concluded that any applicable code relevant to the fall scenario has been violated" is certainly within his purview as a civil engineering expert. That his opinion uses the word "reasonably," which admittedly has its own legal significance, does not make it excludable opinion testimony, as Wiggins's opinion on reasonableness speaks only to whether the subject walkway area was in violation of an applicable code and not a greater liability determination on behalf of Defendant. As the Fourth Circuit held in *Barile*, an expert's opinion on reasonableness is "precisely the type of expert testimony that could assist the trier of fact in its determination.

### IV.     Wiggins did not fail to analyze all relevant data.

Plaintiff alleges that Wiggins failed to consider the effect cleaning products may have had on Plaintiff's fall and that even if he had, Wiggins is not qualified to opine on that effect anyway. First, Wiggins has analyzed a wealth of relevant information to come to his conclusions in this matter: the video footage of the incident, the incident report, various pleadings and discovery responses, Dr. Durig's file material, numerous building codes and voluntary codes, property records, CAF cleaning instructions, and the photos, notes, measurements, and scans from his site inspection on January 3, 2024. *See* Wiggins's Report pp. 7-8, attached. Wiggins testified that one of two kinds of CAF concrete cleaners was used on the date of Plaintiff's fall, but there is no evidence to clarify which one employee Nolan Waples was using on October 19, 2022 and even if there were, neither expert would be able to recreate the condition present on that date. Regardless, Wiggins testified that even though he "didn't grow up with a chemist father"-- referring to Dr. Durig's (who, importantly, also is not a chemist) upbringing -- you did not have to be a chemist to read the instruction for both potential concrete cleaners to see that

they both contemplate a wet application much like the method Waples was using to clean the walkway on the date of Plaintiff's incident. Wiggins Dep. 64:14-19; 71:24-72:16.

Second, to date, *Plaintiff has not alleged that one of the two aforementioned concrete cleaners or any other substance contributed to Plaintiff's fall*. Plaintiff alleges in his Complaint that "Defendant John Doe mopped the store entrance and created an unreasonably dangerous condition in the form of a slip hazard." Compl. ¶¶ 10–11. When asked in discovery what he contends Defendant did to support the allegations in his complaint, Plaintiff also described the incident as follows:

> Defendant and its employees created an unreasonably dangerous condition in the form of a slip hazard on the premises by spraying water and cleaning the sidewalk outside of the Circle K. Plaintiff encountered the dangerous condition when leaving the Circle K and slipped and fell. Defendant and its employee failed to warn Plaintiff of the dangerous condition.

Pl.'s Answers to Def.'s First Interrogs. ¶ 11. Further, Dr. Durig states in his report that the purpose of his investigation was "to review available information to date to determine if a hazardous condition existed with the painted lines on the sloped walkway that caused Mr. Lewis's fall incident." Durig Report, p. 1, Exhibit. Thus, Plaintiff himself has not alleged that the concrete cleaner contributed to his fall, thus his arguments as to Wiggins's failures to consider its effects on the subject area are immaterial.

Even so, Wiggins testified that the concrete in the subject area was "very very rough," had "a lot of disparities," had "a lot of the aggregate showing," and is "a pretty rough surface." Wiggins Dep. 56:5-12. He pointed out testimony from Plaintiff's own expert that in some concentrations, the cleaner would make the concrete more slip-resistant. *Id.* at 71:24-72:5. He testified that while he did not perform testing with either of the two possible cleaners used on the date of the incident, he did not know whether they had any effect on slipperiness because, per the

video, several other people walk through the area without incident. *Id.* at 98:11-99:2. Finally, even assuming Plaintiff is correct in assuming that Wiggins failed to consider certain facts, such critiques go to the weight of his testimony and not the admissibility. *Sparks v. Gilley Trucking Co.*, 992 F.2d 50, 54 (4th Cir. 1993) (noting that a "court may refuse to allow a generally qualified expert to testify if his factual assumptions are not supported by the evidence" but that perceived shortcomings in an expert's theory and technique go more to the weight of the testimony and not its admissibility); *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (finding that failure to include certain variables in a regression analysis went to the probative weight of the analysis, not to its admissibility). Thus, the Court should not exclude Wiggins's testimony, as he is qualified and his opinions do not invade the province of the jury, but rather help them consider issues beyond the ken of the normal lay juror.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court deny Plaintiff's motion *in limine* to exclude Defendant's expert witnesses Dr. Joseph Calandra and Brandon L. Wiggins.

        Respectfully submitted,

        **SWEENY, WINGATE & BARROW, P.A.**

        s/Grace G. Brown
        Ryan C. Holt
        Grace G. Brown
        Sweeny, Wingate & Barrow, P.A.
        Post Office Box 12129
        Columbia, SC  29211
        (803) 256-2233
        **ATTORNEYS FOR THE DEFENDANT**

Columbia, South Carolina

September 30, 2024