IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| **Jonathan Lewis,** | ) | Case No.: 4:23-cv-01720-JD |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **DEFENDANT CIRCLE K STORES,** |
| | ) | **INC.'S REPLY TO ECF NO. 49** |
| **Circle K Stores, Inc., and John Doe,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

Defendant Circle K Stores, Inc. ("Circle K") submits its reply to the court's docket text order entered at ECF No. 49 on June 17, 2025. The court's order directs the parties to file a supplemental brief addressing whether expert medical testimony is legally required to establish causation for plaintiff Jonathan Lewis' alleged injury (an acute patellar tendon rupture resulting from a slip and fall) under South Carolina law. *See* ECF No. 49.

Circle K set forth the facts bearing on its motion for summary judgment in its memorandum in support of the motion, ECF No. 39. It incorporates those facts herein. Circle K sets forth the following additional facts pertinent to this supplemental briefing below.

On January 22, 2008, Lewis was treated by Dr. Clark Butler for a ruptured patellar tendon. [*See* Ex. 1, Butler Dep. Aug. 12, 2024, 10:7–11:14.] He presented to Dr. Butler again twelve years later complaining of left knee pain and swelling. *Id.* at 24:11–17. Among other complaints, Lewis informed medical personnel he had been experiencing pain in his legs for five or six years, along with swelling and "giving way." *Id.* at 24:18–25:2. He also stated he gained 120 pounds over the previous six years. *Id.* Dr. Butler treated Lewis again and performed bilateral tendon repairs. *Id.* at 24:11–17.

The subject incident occurred two years later. Lewis testified as follows about the incident: "That morning I went to Circle K to get some gas. I went in the store like any other time. I paid for my gas. I came out and I slipped. I tried to catch it with my foot, like my toe, and it just buckled and I heard pops in my ear – or a couple of pops in my ear." [*See* Ex. 2, Lewis Dep. March 7, 2024, 30:10–17 (emphasis added).] Lewis reported the same "popping" to emergency medical services personnel when they arrived on-site, and Horry County Fire Rescue personnel Matthew Rockenstyre recorded that Lewis "state[d] they felt a pop in their knee which caused them to fall . . . ." [Ex. 3, Horry County Fire Rescue record dated October 19, 2022.] Mr. Rockenstyre testified this narrative is based entirely on what Lewis told him the day of the incident and that he did not leave any information Lewis told him out of the report. [*See* Ex. 4, Rockenstyre Dep. Aug. 12, 2024, 13:19–14:8.]

Lewis was treated by Nathaniel Evans, M.D., who diagnosed him with a patellar tendon rupture. [*See* Ex. 5, Evans Dep. July 18, 2024, 16:6–9.] Dr. Evans testified patellar tendon ruptures are commonly caused by a patient's "knee bend[ing] quickly or unexpectedly." *Id.* at 12:8–20.[1] Physicians see ruptured patellar tendons in skiing or similar injuries, where, for instance, "somebody's ski gets caught and the foot turns one way and the leg goes the other way . . . ." *Id.* Dr. Clark Butler, who treated Lewis' previous patellar tendon rupture in 2008, likewise testified that ruptured patellar tendons typically occur after "a trip or stumble," though he has seen them occur in falls or when people get out of a low chair. [*See* Butler Dep. Aug. 12, 2024, 16:8–16.] Dr. Joseph J. Calandra, M.D., Circle K's medical expert, testified that slipping is not a

---

[1] In the interest of completeness, the question to which Dr. Evans responded asked as follows: "And would a person who maybe unexpectedly slips or their foot turns one way or their knee turns another way, is that a common cause of a ruptured patellar tendon." However, Dr. Evans' answer does not reference slipping in any way and instead responds to the second part of Lewis' compound question.

biomechanical way of tearing the patellar tendon. [Ex. 6, J. Calandra Dep. July 16, 2024, 22:19–23:1.]

Both Dr. Butler and Dr. Evans testified that a ruptured and treated patellar tendon is never as strong as a patellar tendon that has not previously ruptured. [*See* Butler Dep. at 25:3–16 ("But, you know, it's not as good as the native knee. It never is quite as good as the native knee because of the way the tendon heals to the bone."); Evans Dep. at 40:15–41:8 (testifying that ruptured tendons heal with tissues that is not as good as native tissue and that "you can definitely tell the difference between something that's had surgery before and something that's had a previous trauma and something that has not").] Moreover, all three physicians testified that obesity contributes to a higher likelihood of a recurrent tear. [*See* Butler Dep. at 25:3–10.; Evans Dep. at 41:9–11; Calandra Dep. 23:2–14.]

To prove causation a "plaintiff must introduce expert medical evidence which affords a reasonable basis for the court to conclude that it is more likely than not that the [defendant's] conduct was a substantial factor in bringing about plaintiff's damages." *Ellis v. United States*, 484 F. Supp. 4, 11 (D.S.C. 1978). This proof "must be something more than consistent with the plaintiff's theory of how the claimed damages were caused" and it "cannot rest on conjecture." *Id.* When "the medical causation issue is not one within the common knowledge of laymen, proximate cause cannot be determined without expert medical testimony." *Id.*; *see also Goewy v. U.S.*, 886 F. Supp. 1268, 1279 (D.S.C. 1995) ("Where a medical causal relation issue is not one within the common knowledge of the laymen, proximate cause cannot be determined without expert medical testimony."); *In re Lipitor Litig.*, 227 F. Supp. 3d 452, 470–72 (D.S.C. 2017) (noting all jurisdictions "require expert testimony at least where the issues are medically complex and outside common knowledge and lay experience") (collecting cases). Even if a plaintiff produces medical

testimony in support of an alleged causal connections, courts in this circuit have nonetheless excluded that testimony where the medical testimony is sufficiently "uncertain, conflicting and speculative." *Goewy v. U.S.*, 886 F. Supp. 1268, 1279 (D.S.C. 1995).

However, "[w]hen the results of an alleged act of negligence are such that they are within the experience and observation of an ordinary layman, a jury or court sitting as the trier of facts can draw a conclusion as to the causal relationship without the necessity of expert medical testimony." *Miller v. Atlantic Bottling Corp.*, 259 S.C. 278, 282, 191 S.E.2d 518, 520 (S.C. 1972). In *Miller*, the plaintiff drank two or three swallows of beverage from a bottle of Mountain Dew and immediately thereafter noticed the Mountain Dew smelled and tasted vile. *Id.* at 280, 191 S.E.2d 519. The plaintiff immediately began to feel sick, her throat and chest began to hurt, and she became nauseated before vomiting five to ten minutes later. *Id.* The plaintiff vomited intermittently and had an unsettled stomach for approximately two days after she drank the Mountain Dew. *Id.* A "large mass of unidentified foreign substance" was ultimately discovered at the bottom of the bottle. *Id.* The *Miller* court concluded that the plaintiff did not need expert testimony to create a reasonable inference that her illness was caused by drinking the beverage. Specifically, the court noted the Mountain Dew contained a foreign substance and was "repulsive in appearance and had a vile smell and taste." *Id.* The court also credited the plaintiff's testimony that she was "in good health" before she drank the Mountain Dew, holding it did "not think that a reasonable person would necessarily require medical testimony in order to determine that the drinking and discovery of a foreign substance of the present nature in a bottled drink most probably caused the nausea and vomiting which immediately followed the discovery." *Id.* at 281–82, 191 S.E.2d 519–20.

The South Carolina Supreme Court's earlier decision in *Gambrell v. Burleson* is also instructive for the Court here. In that case, the administrator of the estate of Lester Gambrell sued defendants James and Miriam Burleson after an automobile accident occurred between Gambrell and the Burlesons. *See Gambrell v. Burleson*, 252 S.C. 98, 100, 165 S.E.2d 622, 622 (S.C. 1969). At the time of the collision, Gambrell had dormant cancer that was, as his estate alleged, aggravated by the collision. *Id.* at 100, 165 S.E.2d at 622–23. The court there noted testimony that "a plaintiff *in good health prior to an injury* begins to complain on the day of the injury with what he claims to be a condition resulting from the injury . . . may be sufficient evidence of causation, even when the only medical opinion testimony is that there is no causal connection." *Id.* at 105–06, 165 S.E.2d at 625 (emphasis added). The court also noted Gambrell's "cancer was admittedly in existence at the time of the injury" and that Gambrell survived for a period after the accident that is typical for one afflicted with his cancer. *Id.* at 107, 165 S.E.2d at 626. The court thus concluded "that the non-expert testimony [did] not so immediately and directly or naturally and probably connect the collision with the cancer as to make proof legally sufficient." *Id.*

With the pertinent record evidence and legal principles in mind, Circle K turns to answering the court's inquiry: whether Lewis' circumstantial evidence—specifically, his lay testimony—is sufficient to create a genuine issue of material fact on the issue of causation, particularly where his injury may have multiple potential etiologies.

In short, it cannot. Lewis did not suffer a run-of-the-mill injury; if Lewis simply alleged, say, he slipped, fell, and suffered cuts, bruises, or even a fracture, because of the fall there is no question that such testimony would be within the common knowledge of a lay person. Here, however, Lewis alleges he slipped, *causing his patellar tendon to rupture*, and fell because of the ruptured patellar tendon. [*See* Lewis Dep. March 7, 2024, 30:10–17.] This is not the "vile foreign

substance in a bottle of Mountain Dew" scenario the *Miller* court held did not require expert testimony; whether a slip and fall can cause a patellar tendon to rupture is unquestionably outside of the common knowledge of a lay person. So, Lewis must provide expert testimony to support his theory of causation.

He has not done so. As discussed above, there is no expert testimony suggesting a slip can cause a person's patellar tendon to rupture. On the contrary, both of Lewis' treating physicians testified they typically see patellar tendon ruptures in, for instance, skiing accidents where a patient's knee bends quickly or unexpectedly or in trips or stumbles. [*See* Evans Dep. at 12:8–20; Butler Dep. at 16: 8–16.] And Dr. Calandra testified outright that slipping is not a biomechanical way of tearing the patellar tendon. [*See* Calandra Dep. at 22:19–23:1.] Lewis' theory of the case—that he slipped, causing his patellar tendon to rupture—thus directly conflicts with *all* the expert testimony proffered to date.

Lewis' lay testimony is not sufficient to establish a causal connection here, either. As noted above, federal and district courts in South Carolina have generally found lay opinion testimony sufficient where a *formerly healthy* plaintiff complains of injury immediately to very shortly thereafter an allegedly negligent act occurs. *See, e.g.*, *Miller*, 259 S.C. at 281–82, 191 S.E.2d 519–20 (expert medical testimony not necessary where healthy plaintiff's symptoms occurred immediately after plaintiff drank from the bottle of Mountain Dew); *Gambrell*, 252 S.C. at 107, 165 S.E.2d at 626 (lay testimony not sufficient where, among other things, decedent's cancer existed prior to the automobile collision). But Lewis' medical history makes clear he was *not* a healthy plaintiff prior to his slip and fall. Quite the opposite, in fact: he received bilateral patellar tendon repairs in 2008 and 2020 and gained 120 pounds between 2014 or 2015 and 2020. Moreover, both his treating physicians concede a repaired patellar tendon is never as strong as a

"native knee." And all three physicians testified obesity can also contribute to weakening an already weakened tendon. Like the plaintiff in *Gambrell*, the ultimate injury of which Lewis complains—the ruptured patellar tendon—did not materialize out of nowhere immediately after the underlying incident. Rather, Lewis previously received two bilateral patellar tendon repairs, which his treating physicians concede rendered his patellar tendons weaker than they would be had Lewis never received prior repairs. Lewis' testimony thus does not so clearly and immediately connect his alleged slip with his ultimate injury that the court may allow it in place of qualified expert testimony.

For these reasons, Circle K respectfully submits the court must enter summary judgment in its favor because Lewis has failed to shoulder his burden on the issue of causation.

                              Respectfully submitted,

                              **SWEENY, WINGATE & BARROW, P.A.**

                              s/Mary Cothonneau Eldridge
                              Ryan C. Holt, Fed. I.D. No. 10736
                              Mary Cothonneau Eldridge, Fed. I.D. No. 12540
                              Sweeny, Wingate & Barrow, P.A.
                              Post Office Box 12129
                              Columbia, SC  29211
                              (803) 256-2233

                              **ATTORNEYS FOR THE DEFENDANT**

Columbia, South Carolina
July 1, 2025