**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

**No. 25-1964**

―――――――――――

JONATHAN LEWIS,

        Plaintiff – Appellant,

v.

CIRCLE K STORES INC.; JOHN DOE,

        Defendants – Appellees.

―――――――――――

Appeal from the United States District Court for the District of South Carolina, at Florence.
Joseph Dawson, III, District Judge.  (4:23−cv−01720−JD)

―――――――――――

Argued:  March 19, 2026                                      Decided:  May 13, 2026

―――――――――――

Before WILKINSON, RICHARDSON, and HEYTENS, Circuit Judges.

―――――――――――

Reversed in part, vacated in part, and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Richardson and Judge Heytens joined.

―――――――――――

**ARGUED:**  Brian James Lee, MORGAN AND MORGAN, Jacksonville, Florida, for Appellant.  Ryan Charles Holt, SWEENY, WINGATE & BARROW, P.A., Columbia, South Carolina, for Appellee.  **ON BRIEF:**  Joseph Sandefur, MORGAN AND MORGAN, Jacksonville, Florida, for Appellant.  Mary C. Eldridge, SWEENY, WINGATE & BARROW, P.A., Columbia, South Carolina, for Appellee.

―――――――――――

WILKINSON, Circuit Judge:

While exiting a convenience store in South Carolina, plaintiff-appellant Jonathan Lewis stepped on a painted line in the parking lot that an employee had just washed with water and a powdered concrete cleaner. In so doing, he fell, severely injuring his right leg. Lewis thus brought a premises-liability action against the merchant, Circle K Stores Inc. ("Circle K"), for its failure to properly warn him of the parking lot's slippery conditions.

The district court granted summary judgment in favor of Circle K, reasoning that the danger was "open and obvious" and that Lewis failed to provide expert testimony establishing a causal link between the slip and his injury. But in light of extant factual disputes, such questions of breach and causation are best reserved for the jury. We therefore reverse the district court's grant of summary judgment, vacate its concurrent *Daubert* and spoliation decisions, and remand for further proceedings consistent with this opinion.

I.

We hear this case on appeal from a Rule 56 motion for summary judgment and thus construe all evidence and draw all inferences in the light most favorable to Lewis, the nonmoving party. *Brown v. Wal-Mart Stores E., LP*, 139 F.4th 356, 362 (4th Cir. 2025).

A.

Circle K owns and operates thousands of convenience stores and gas stations in the United States and abroad. On the morning of October 19, 2022, Lewis drove to a Circle K location along US-501 in Myrtle Beach, South Carolina. He parked at a pump and entered the convenience store to pay for his gas. At this time, a Circle K employee, Nolan Waples,

was sweeping outside the store entryway with water and a powdered concrete cleaner. Waples was wearing his standard red employee uniform but had not donned a "yellow reflective vest" as required under company policies. J.A. 398. Beyond Waples' mere presence and the observably wet concrete, there were no signs, cones, or other warnings that cleaning was in progress.

After paying for gas, Lewis exited the store, walked past Waples, and stepped onto the wet parking lot, placing his foot on a painted white line. Lewis reports that his foot began to "slip" and that he could feel his "right foot just out of control." J.A. 719. He attempted to "catch [his] fall" using "[his] big toe" and "the balls of [his] feet." J.A. 718–19. To no avail. His knee buckled, he slipped, and he heard and felt a popping sensation in his leg. Lewis landed on the ground "in a puddle of some kind of liquid," J.A. 720, with "a sharp pain" spreading "all over [his right] leg," particularly his kneecap, J.A. 718. His foot also became significantly swollen.

While Waples did not directly observe the incident, he came up to Lewis after the fall and noticed a "visible slip mark on the painted lines" near where Lewis fell. J.A. 740. Upon Lewis' request, Waples called for an ambulance. Lewis spent roughly two hours in the emergency room before returning home.

The next day, a surgeon diagnosed Lewis with a patellar tendon rupture. He underwent surgery for his injuries and incurred medical expenses of approximately $430,000. J.A. 49. Despite these operations, Lewis' surgeon assessed him as having a seven-percent permanent impairment to his right leg. J.A. 150. Lewis had ruptured his patellar tendon once previously in high school.

B.

In November 2022, Lewis sued Circle K in South Carolina state court, alleging that Circle K was or should have been aware of the hazard it had created, and that it failed to take action to rectify the condition or to adequately warn Lewis of any danger. Circle K successfully removed the case to the United States District Court for the District of South Carolina based on diversity of citizenship. *See* 28 U.S.C. § 1441(a).

To develop his theory of liability, Lewis hired an engineering expert to examine Circle K's concrete cleaner and the coefficient of friction of the parking-lot stripe at the location of Lewis' fall. By August 2023, Circle K knew that Lewis sought to inspect the parking lot. However, on September 22, 2023, a third-party contractor repainted the stripes in Circle K's lot. According to Circle K, this repainting was part of routine, prescheduled maintenance and remodeling. But because Lewis' expert arrived at Circle K only afterward in October 2023, he was unable to take appropriate coefficient-of-friction measurements.

Subsequently, after extensive discovery, Circle K moved for summary judgment. The district court granted the motion, providing three independent rationales for why there were no genuine disputes of material fact. First, it found that Circle K did not breach its duty to warn invitees of hazards it created on store premises because these conditions were "open and obvious." Specifically, it reasoned that Waples' cleaning and the resulting wet concrete were "clearly observable," and because "Lewis himself testified that he was not paying attention[,] [a] reasonable jury could not, therefore, find [the hazard] obstructed." J.A. 765. Second, the district court found that there was no evidence "that Circle K had

4

been warned or otherwise knew that cleaning the entryway posed a specific danger to customers." J.A. 766. Thus, Lewis did not establish that Circle K could have reasonably foreseen that the wet concrete would result in injuries, even assuming that the hazardous condition was self-evident. And lastly, the district court concluded that Lewis did not submit adequate expert testimony causally linking his patellar tendon rupture to Circle K's negligence.

Concurrently with granting summary judgment, the district court denied two of Lewis' motions: (1) a *Daubert* motion to exclude Circle K's expert testimony, and (2) a spoliation motion pertaining to the repainting of the parking lot. The district court reasoned that Lewis' challenges to the expert testimony went exclusively to weight and credibility, rather than admissibility. And it found spoliation sanctions inappropriate because, even assuming Circle K had a duty to preserve the original parking-lot stripes, Lewis did not establish that its "routine maintenance" was performed in bad faith or constituted willful misconduct. J.A. 776.

Lewis timely appealed.

## II.

We review the district court's grant of summary judgment *de novo*. *Brown*, 139 F.4th at 362. If there exists a genuine dispute of material fact, we reverse and remand the case for further proceedings in the district court. *Id.* As with any tort suit, we apply substantive state law—in this case, South Carolina law—and examine the four elements of negligence: duty, breach, causation, and damages. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78

(1938); *Savannah Bank, N.A. v. Stalliard*, 734 S.E.2d 161, 163–64 (S.C. 2012). Circle K does not dispute that Lewis established duty and damages. Rather, consistent with the district court's reasoning, it argues that there was no genuine dispute of material fact (1) with regard to breach, because the hazard was "open and obvious" as a matter of law; and (2) with regard to causation, because Lewis did not submit relevant expert testimony. But the district court erred on both counts.

### A.

Before we turn to breach, we must first examine the contours of the duty owed to Lewis. Duty and breach are intertwined. The scope of Circle K's duty determines the range of actions or omissions that constitute a breach.

Here, Lewis, as a patron of Circle K, was a public invitee to the store premises. *Fountain v. Fred's, Inc.*, 871 S.E.2d 166, 171 (S.C. 2022). And merchants owe an invitee the "duty of exercising reasonable or ordinary care for his safety, and [are] liable for any injury resulting from the breach of [such] duty." *Graham v. Whitaker*, 321 S.E.2d 40, 43 (S.C. 1984). As part of this duty, Circle K must make reasonable efforts to keep its premises clear of dangerous conditions or to warn invitees of hidden hazards of which it has actual or constructive knowledge. *See Henderson v. St. Francis Cmty. Hosp.*, 399 S.E.2d 767, 768–79 (S.C. 1990); *Sims v. Giles*, 541 S.E.2d 857, 863 (S.C. 2001); *Brown*, 139 F.4th at 362 ("[A] business should not be expected to remove hazards that it has no way of knowing about.").

6

"Reasonableness" is a flexible term that reflects the individual contexts of the premises, the merchant, and the invitees. In other words, "[t]he degree of care required must be commensurate with the particular circumstances involved, including the age and capacity of the invitee." *Graham*, 321 S.E.2d at 43; *see also Henderson*, 399 S.E.2d at 768; *Brown*, 139 F.4th at 366. We would not, for example, subject the owner of a construction site to the same standard of care as a hospital in maintaining a parking lot; too big a gap exists between the nature of expected invitees at these two sites. *Compare, e.g.*, *Larimore v. Carolina Power & Light*, 531 S.E.2d 535, 540 (S.C. Ct. App. 2000), *with Henderson*, 399 S.E.2d at 767.

But when a business such as Circle K opens itself up to the general public and offers an essential commodity like gasoline, a wide range of invitees becomes reasonably foreseeable. Indeed, the merchant should expect significant variances in the "age and capacity" of its customers. *Graham*, 321 S.E.2d at 43; *Henderson*, 399 S.E.2d at 767. Among them will certainly be the elderly, disabled, chronically ill, and other fragile groups. *See, e.g.*, *Callander v. Charleston Doughnut Corp.*, 406 S.E.2d 361, 363 (1991); *Lowrimore v. Fast Fare Stores, Inc.*, 385 S.E.2d 218, 221 (S.C. Ct. App. 1989). Circle K's duty of reasonable care plainly extends to these vulnerable populations. It cannot make efforts to render its premises safe only for the young, well-balanced, and sure of foot.

This heightened degree of care informs our view of the protective measures Circle K must take to warrant summary judgment in its favor. Nothing in the record suggests that Circle K met this threshold.

B.

Store owners generally escape their duty of reasonable care if a hazard is "open and obvious" such that a reasonable invitee would notice and take measures to avoid it. *Callander*, 406 S.E.2d at 362 (adopting the standard set forth in the Restatement (Second) of Torts § 343(a) (Am. L. Inst. 1965)). But the simple quality of observable wetness on concrete is insufficient to render the concrete an "open and obvious" danger as a matter of law. *See, e.g.*, *Lowrimore*, 385 S.E.2d at 221. The average American comes across wet concrete as a matter of course without a second thought. Many would not, for example, perceive a sidewalk post-rainfall as a danger. Indeed, in outdoor and commercial settings, concrete pathways are often designed to mitigate slipperiness by enhancing water drainage and surface abrasiveness. *See, e.g.*, Hugo Silva et al., *Engineering-Based Evaluation of Sidewalk Pavement Materials: Implications for Pedestrian Safety and Comfort*, Int'l J. Pavement Rsch. & Tech. (2025).

The real hazard here is the unacknowledged presence of a chemical cleaning agent. And whether the use of that chemical was "open and obvious" remains a genuine dispute of material fact which only a jury may properly decide. Indeed, differentiating between concrete made wet from pure water and concrete made wet from a mixture of water and powdered chemicals can be a difficult task. The range of human vision does not extend to molecular composition, and thus we rely on context clues, such as effervescence, iridescence, discoloration, or smell. Absent such indicia, "a reasonable inspection of the concrete entrance" would not discern any latent hazard. *Fountain*, 871 S.E.2d at 172.

We also look at the context in which the liquid is being applied. Here, Circle K argues that the presence of Waples holding a broom made the hazard clear. But the act of cleaning does not necessitate the use of chemical cleaners. Nor does the presence of a broom make the use of chemical cleaners more likely. Brooms are more commonly used to sweep aside waste deposits and excess water than to apply chemicals that reduce surface friction. Invitees might see the broom and rationally assume Waples used it as would the average homeowner. Indeed, Lewis himself elucidated this assumption: "I thought [Waples] was taking a break or just sweeping the ground with a regular broom. I didn't know [Waples] was putting liquid or solution on the ground." J.A. 590. And while mistaken, his belief was entirely reasonable.

Holding as a matter of law that the wet entrance here was an "open and obvious" hazard would require much clearer signals of unusual slipperiness. Signage, cones, and even yellow safety vests would have helped convey the hazard to invitees. But Circle K employed nothing of the sort, even though company policy appeared to require otherwise. *See* J.A. 398.

Of course, merchants need not take *every* conceivable action to make a hazard open and obvious. But we are not dealing with a case of layered redundancies. The use of such commonplace alerts as signs and cones imposes no unwarranted burden upon a store owner. The complete absence of such things, however, suggests "nothing to worry about" to potential customers. In order to warrant summary judgment, a store owner must either show that there is no genuine dispute of material fact as to whether (1) the hazard is so obvious that no reasonable invitee would stumble upon it or (2) the owner took sufficient

affirmative steps to flag the danger to invitees. Circle K did not make either showing, and thus it would be inappropriate to affirm summary judgment in its favor.

Instead, a jury must weigh the various context clues present in the record and determine whether a reasonable person could have perceived Waples' use of chemical products and known that this created a hazardous condition.

III.

The district court erred further in determining that Lewis cannot establish causation without providing expert testimony. South Carolina law begins with the baseline that the jury may rely on its ordinary experience to inform the causal nexus between incident and injury. *See, e.g.*, *Bramlette v. Charter-Med.-Columbia*, 393 S.E.2d 914, 916 (S.C. 1990) ("Expert testimony is not required, however, to prove proximate cause if the common knowledge or experience of laypersons is extensive enough to determine the presence of the required causal link . . . ."). Only when the scientific complexity of causation exceeds the average juror's common knowledge does state tort law mandate submission of expert testimony. *Id.* ("Generally, expert testimony is required to establish proximate cause in a medical malpractice case."); F. Patrick Hubbard & Robert L. Felix, *The South Carolina Law of Torts* § 2.C.4 (5th ed. 2026).

Consider, for example, the toxicological ramifications of chemical exposures, clinical psychological impacts of physical injuries, or the long-term development of diabetes after taking certain pharmaceuticals. *See, e.g.*, *Goewey v. United States*, 886 F. Supp. 1268, 1279–80 (D.S.C. 1995); *Smith v. Michelin Tire Corp.*, 465 S.E.2d 96, 97 (S.C.

10

Ct. App. 1995); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 227 F. Supp. 3d 452, 478 (D.S.C. 2017), *aff'd*, 892 F.3d 624 (4th Cir. 2018). In these cases, a layperson has little basis on which to generate an inference absent expert testimony. Any verdict would thus reflect a high degree of conjecture or speculation.

Here, however, we do not face such technical or medically complex questions. The nature of a slip-and-fall remains well within the ambit of human experience. True, the average juror may not be able to identify the patellar tendon or the mechanisms by which it can rupture. But such explanations are not necessary to resolve causation. Lewis started losing his footing on a wet surface, he heard and felt a pop in his knee, his knee buckled, his foot slipped, and he landed on the ground in severe pain. A layperson has sufficient experience to infer that contortions of the leg can cause connective-tissue damage, and that the popping sound and sudden leg pain after the "slip" began was evidence of just such damage. *See* Dan B. Dobbs et al., *The Law of Torts* § 184 (2d ed. 2026).

Indeed, the immediate onset of symptoms after a physical injury or hazardous exposure is classic circumstantial evidence that juries may consider. *See Swink v. S. Health Partners Inc.*, 160 F.4th 438, 470 (4th Cir. 2025) (Richardson, J., concurring) ("A medically causal relationship can be established when temporal proximity exists between two events that in the abstract have an established causal relationship."); *In re Lipitor*, 227 F. Supp. 3d at 477–78 (collecting cases from various jurisdictions); *Miller v. Atl. Bottling Corp.*, 191 S.E.2d 518, 520 (S.C. 1972) (indicating that "immediate onset of nausea and vomiting" after consuming a "vile smelling and tasting, and revolting foreign substance" was evidence "within the experience and observation of the ordinary person").

11

Certainly, both Lewis and Circle K are well within their rights to propose expert testimony to supplement or rebut lay testimony. This may include evidence that Lewis' prior patellar tendon injury increased the probability that a spontaneous rupture caused his fall. Indeed, upon remand, the district court may admit such experts as will aid the jury in its deliberations. *See* Fed. R. Evid. 702(a). But we decline to make this evidence mandatory. The slip-and-fall is among the most foundational and understandable injuries. If we required expert testimony in this case, we would steal from the jury one of its principal functions and remove from tort law the everyday experience of man.

IV.

The admission of expert testimony and sanctions for spoliation of evidence remain matters of district-court discretion. *Nease v. Ford Motor Co.*, 848 F.3d 219, 228 (4th Cir. 2017); *Wall v. Rasnick*, 42 F.4th 214, 217 (4th Cir. 2022). However, because the district court disposed of all the motions concurrently in a single order, we vacate the *Daubert* and spoliation determinations and remand for further proceedings. With respect to spoliation, the district court should take particular care to evaluate and apply the standards set forth in *Silvestri v. General Motors Corp.*, 271 F.3d 583 (4th Cir. 2001), and *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446 (4th Cir. 2004).

V.

It is too easy to dismiss a slip-and-fall case as somehow beneath appellate notice. Indeed, the term "slip-and-fall" itself has gained a connotation rife with belittlement. But

12

our Constitution sees all cases and controversies as sharing, in one sense, an equal import. Rightly so—to the litigants involved, it is their dispute. There is no other.

Slip-and-fall claims in fact illustrate this principle better than most. To the injured party, a slip-and-fall represents a serious, detrimental, and sometimes life-altering affair. Especially for the elderly, disabled, and those with certain chronic conditions, a fall can lead to hospitalization from which there is no return. And even when, as here, the outcome is less grievous, pain, immobility, and disruption to one's daily routine still loom large. The suit is therefore both intimate and visceral to the plaintiff. One of the core functions of courts remains the resolution of such private torts, not just to vindicate individual parties, but also to ensure the safety of others in the future.

That is hardly the end of the matter, however. It works a fundamental wrong to defendants to affix liability where it does not belong. It advances no view of justice to assign responsibility to one whose conduct has remained lawful throughout. The rightness and wrongness of it all is for a jury to decide; its communal voice is needed here, and we thus remand this case for trial.

*REVERSED IN PART, VACATED IN PART, AND REMANDED*